Good morning, Your Honors. Todd Burns on behalf of Terrence Ellison. My hope is to reserve three minutes to rebuttal and my plan is to address the first two issues raised in the opening brief, which were with respect to the admission of the cooperator Anthony LaDaze begging to cooperate letter and the, I'm sorry, the preclusion of that and the admission of cooperator LaTanya Alexander's post-duress statements. Beginning with the letter, Mr. LaDaze had a meeting with prosecutors in August 2021. In December 2021, four months later, he wrote to them, one of the prosecutors, a letter saying, I thought I would have heard from you by now. I'm asking for another chance. I'm seriously begging. I want to go home. He mentioned other drug activities that he could provide information about and he said, if I fail you, we both know my fate. A reasonable, easy reading of that letter for the jury as it expresses his motivation to, first of all, that the government was unsatisfied with this initial cooperation and secondly, his motivation to satisfy the cooperators to say what he needed to say, including to lie, to go home. And subsequently, in addition to that sort of state of mind purpose of the letter, subsequently, Mr. LaDaze gave testimony at trial that was inconsistent with the letter. And I want to pivot in addressing that, the government's argument that plain error should apply, which is somewhat surprising to me because defense counsel tried to admit this over and over and over again. There was a lot of discussion about it. And during that discussion, the first time it came up was when Mr. LaDaze was still on direct testimony. It wasn't even on a cross. And the letter came up and government counsel said, it's not admissible because it's extrinsic evidence under federal rule of evidence 608. As I understand, I think the government is saying that it's plain error review for arguments raised for the first time on appeal about the state of mind and verbal act exceptions to hearsay. And during that first discussion, the government said, the government didn't even allege it was hearsay. They just said it's not admissible under rule 608. The judge then said, I think it's hearsay. And defense counsel at that point said, he's already testified, Mr. LaDaze already testified that he has no agreement with the government. He obviously, based on the letter, has an expectation of benefit from his testimony. So that's both inconsistent statement and the expectation goes to state of mind. And then when Mr. LaDaze comes, after he testifies on a cross-examination, it repeatedly comes up that they're seeking to introduce, that the defense counsel's seeking to introduce the letter to impeach him as to his state of mind, obviously. And also, of course, as to his bias, as to his motive to lie. And the district court, it's obvious the district court understands that. More than once, the district court says, you know, I understand that it indicates that the court understands that the letter's being used to impeach with prior inconsistent statement, but says that it's not going to allow his extrinsic evidence. So that's one time that that's obvious, is it 3E or 340? Well, let me ask this, Mr. Rimswood. You know, ultimately, counsel was able to impeach him with the letter and get Mr. LaDaze on cross-examination to admit that he wrote that I was begging to cooperate with the government. So why, and I think defense counsel even said at trial, I got what I needed from the cross-examination. So why, why press that issue now? What more would the letter have added itself, misguided the cross-examination? Mr. LaDaze actually didn't admit that he was begging to cooperate. What he said is the letter had nothing to do with my cooperation. I had already been cooperating before that. I was just saying I wanted to go home because some people got lesser sentences than I did, and repeatedly said to defense counsel, you're misconstruing my words. Well, an easy way to see if defense counsel's... With a question, okay, but you were asking for a chance to cooperate. Answer, that's telling him I will cooperate if I'm given a yes, if I'm given a chance, yes, I will. Question, and you're begging for it, really? Answer, no. Question, that's what your words are? Yeah, I wrote that. I'm begging for a chance. To me, that really says what the letter that you're trying to get admitted says. But well, two things. It doesn't, it certainly doesn't convey the point that he had been cooperating before, and he comes back and he says, look, I'm asking for another chance. I'm begging. We both know my fate if I don't deliver. That's what matters, isn't it? The jury finds out that, yeah, he's begging for a chance to cooperate, and that's the motivation. That's what you're trying to use to impeach his testimony, generally, or your predecessor was trying to use. But I think the real impact of it is that he evidently has not satisfied them in August of 2021, and he's saying to them, look, I thought I would have heard from you by now. I'm begging for a chance, and making clear, like, look, if I didn't satisfy you before, I will satisfy you now. I want to go home. Well, I mean, your point went on. Really trying to follow up and do a chance as a question. Didn't all that come out in the examination? Wasn't he effectively impeached by that, and so on, with the letter? I don't think it did, because he repeatedly fought defense counsel. If I may, what page were you reading from of the excerpt there, Your Honor? A reading from 342, 343. It basically goes on back and forth until about 347 or 348, and there's a point at which he says, you're misconstruing my words, which I think was at 343. I believe he says that more than once, but he's fighting defense counsel, and even the government says in its brief what he was saying was that the letter was just because I was upset that some people had more serious cases than me and got lower sentences, so he's fighting and telling defense counsel you're misconstruing my words, so I don't think defense counsel got the thrust of that out, and if he's saying you're misconstruing my words, what better thing for the jury to see to decide for itself than the letter, and in reality, coming back to the plain error thing, when defense counsel again tries to introduce it later on in the day after he's done testifying, he says, look, I'm going to try and introduce the letter again. Obviously, she didn't feel like she got what she needed by that point, and the district court said, I think that is hearsay. It was used to impeach, and I don't find it as permissible to offer it as extrinsic evidence. That's 3ER567, and at that point, it seems pretty evident the district court is adopting the government's Rule 608 argument, which is wrong. The government never in the district court mentioned Rule 613, and its answer in brief, it never references 608, not a cite to it, not a mention of it, because 608 was wrong. The district court applied the wrong rule to exclude the letter, and that's plainly erroneous. It's abuse of discretion to apply the wrong rule. That's sort of the end of the question, and there's no doubt that Ledet said a number of things that were inconsistent with the letter, starting, as I mentioned already, with the fact that he didn't expect any sort of benefit for his testimony. He also repeatedly said that he didn't beg, and that was included in 343 as well. I think in 343, he says he didn't beg, but he does by 346, so I guess maybe you want to move on to the Alexander letter, but I guess the point that both Judge Clifton and I were making is a lot of the substance of what defense counsel wanted to get in did get in through that cross-examination. I think if you look at the 10 pages there, where he's fighting her, I don't think the power of it, of the fact that he was willing to come back to government counsel and say, look, why haven't I heard from you? I'm going to do what you need to do. I don't think that was made. He's fighting her on it repeatedly, and there's just no good reason to preclude it, and the jury should have seen it and made that judgment for itself. Turning to the Latoya Alexander mission of her post-arrest statements, during her direct testimony, she gave testimony indicating that it was a person named Junior, Anthony Wiseman, who first raised the smuggling indefinite with her, and they devised a plan, and that she and her junior were talking about paying someone else, a person named Matthew McHugh, and $1,000, so she assumed that Junior was going to pay her $1,000. That was all good for the defense, making Junior the person that orchestrated this thing. Defense counsel ran with that on cross, and had Ms. Alexander admit that it was Junior that told her to carry drugs across the border, not Mr. Ellison, that Junior instructed her on what she needed to do. Mr. Ellison wasn't there when that happened, and it was Junior who arranged for her to pick up these drugs from Primo, not Mr. Ellison. It's all consistent with her direct testimony. It's all exculpatory, positive testimony. After the cross is over, a government counsel gets up and says, well, defense counsel raised that Ms. Alexander is interested in getting benefits for her testimony, so that's attacking her testimony, so we should be able to bring in her prior statements, her post-arrest and her sentencing statements. Well, I don't know if that's exactly accurate, because defense counsel did raise her post-arrest statements in a question, and then later at sidebar, from my reading of the transcript, defense counsel admitted that the post-arrest statements were raised during her cross-examination. I think defense counsel was mistaken about post-arrest statement. The only thing that I see, and the only thing that I pointed out, and government counsels have disputed. I've read a question from defense counsel that your post-arrest statement, etc. She raised an inconsistency with respect to the trip to Las Vegas, and that statement was taken from Ms. Alexander's sentencing papers. It is technically post-arrest, but it wasn't their statements to agents post-arrest. There was a post-arrest statement about going to Las Vegas in order to pick up her belongings. That's true, but as opposed to, so version number one, to pick up her belongings with Ellison. Version number two, that she went to Las Vegas with Ellison, with Mr. Ellison, in order to recruit people for the drug conspiracy. As I understand defense counsel, she raised the post-arrest statements in her questioning about what the purpose of the Las Vegas trip was. That is true. So that's what brought in, as I understand it, government's point was, or the district court agreed, the post-arrest statements can come in because defense counsel acknowledges that she opened the door in her questioning. Well, that would only open the door to questioning about the post-arrest statement. Right. And about the sentencing filing issue. Post-arrest statement about the Las Vegas trip. But I do believe that Ms. Alexander's statements about the Las Vegas trip were made in her sentencing papers, not to the agents. I don't have the site to that handy right now. I'll try and pull it out during your vote. But regardless, at the point that she's arrested, she obviously has a motive to lie. I mean, the first thing that the government introduces when they get up to bring out her post-arrest statements is, you told the agents after you're arrested that Mr. Ellison set you up. She obviously has a motive to lie about that, to deflect attention to her. And that's the same thing as this court's case in Colicott. I mean, even in Miller, she doesn't have to be deflecting attention from herself. Once you're under arrest and they're asking about your circumstances leading to your arrest, you obviously have a motive to lie. Counselor, I think the real difficulty you have with this argument is that defense counsel agreed to allow the sentencing filing statements to come into trial. But the post, you know, when government said we want to bring in two consistent statements, post-arrest statements and the sentencing filing statements, defense counsel agreed to let it come in. And so the question that I was going to have for you is, is this invited error? When the district court first brought this, when government counsel first brought it up and the district court turned to defense counsel to respond, and this is at 3 ER 474-75, defense counsel said that after her arrest, Ms. Alexander indicated that she wanted to cooperate against Mr. Ellison. And then she's interrupted by the district court. She doesn't get to finish and the district court says, you went to the post-arrest statements, so it's coming in. So on 475 it says, so I think the only issue that's left is she made a statement at the sentencing where she was apparently was consistent with something that she said in her post-arrest statement or consistent with what she said here today. So I think the question is that, do you object to that introduction of that statement? Ms. Garcia, I don't object, but that opens a door for me to also address any inconsistent statements on that specific proffer. I read that to be a concession by defense counsel to allow the sentencing filing statements to come in. On page 474, however, when the district court first asks, says to defense counsel, do you wish to be heard that on the sentencing comment? And Ms. Garcia says at the time of her post-arrest statement, she wanted to cooperate is my recollection of it, but I would have to review the statement again. And then government counsel says something to defense counsel, the court says no, but I'm focusing on 475 and what I read to be a pretty obvious agreement to allow this to come in. And so, you know, the briefing suggested this be reviewed for plain error. I'm wondering why this wouldn't be invited error if government, and then I know it wasn't you that did this, but if counsel's agreed to let it come in, why is there a claim of error now? Immediately before that, Ms. Garcia, is my recollection is that her post-arrest statement, she made some indication that she wanted to, and then she's interrupted by the district court. That is obviously an indication that she has a motive to lie at that point. And then the district court says, well, I'm going to allow in the post-arrest statement because you went into it. So she's correct. The best reading of that, I think, so the other side is correct that she went into the post-arrest statement. I think she's mistaken about that. I don't think she went into the post-arrest statement. I think the only thing she went into was the Las Vegas statement, which ended up coming from the sentencing, Ms. Alexander's sentencing page. On ER 470, Ms. Garcia says, and in your statement, this is questioning Ms. Alexander, and in your statement post-arrest, you indicated that MB and Mr. Ledet drove you to Las Vegas in order to retrieve your personal belongings in your vehicle. That is what the court is referencing in the cross-examination for the post-arrest statement. And I get that, and I think Ms. Garcia is wrong because when the government then introduces the statements, it first goes through some post-arrest statements, and then it goes through some sentencing statements. And the Las Vegas statement is from the sentencing statements, not from the post-arrest statement. I have a different reading of the transcript, but I guess we'll respectively disagree with that. Well, that's later. It's when the government starts introducing the testimony they described. But why would she have a motivation to lie at a sentencing filing when the government had not approached her about, or contacted her until after her sentencing? Why would there be a motivation to lie at that? Well, she's asking for a minor role adjustment, so she's blaming it on Mr. Ellison. So she's got an obvious, clear, strong motive to lie. But the court's case law goes back to the time of arrest, really, or even the time of detention. In Colicotte, the person's detained and asked about some drugs that were found in the room. And the court says she obviously wants to deflect from the drugs being attributed to her, so she's got a motive to lie at this point. The same thing here, she obviously wants to blame Mr. Ellison for her criminal conduct, so she has a motive to lie about that. And it's glaringly clear, the first thing the government introduces as far as the post-arrest statements are, you told the agents that Mr. Ellison is the one that set you up. Well, obviously, she's got a motive to lie about that. And it's not really a specific subject. Should we read any indicia of reliability over the fact that she's filing these in court under oath? She is asking for sentencing leniency, but should we read into anything over the fact that this is a statement that's being made to the court itself? No. And it goes to the second part of what I was just about to say, which is, when you're looking at whether or not there's a motive to lie, it's sort of a generic, in this situation, is there a motive to lie? You don't question with respect to every individual witness, well, do I really believe this witness had a motive to lie? It's more based on the time and the circumstances. It's an objective assessment. So someone who's been arrested and is being questioned about the circumstances leading up to the arrest, obviously has a motive to lie about those. Okay. Well, we've let you go a little bit over, so we'd like to hear from you right now. Thank you. I please the court. Zach Dow on behalf of the United States. I'll start with the letter. I think it's important to note, and I'll just quote from defense counsel at trial at page 567 and 68. The statement was, Your Honor, I think all the evidence came in through the testimony as far as the points I'd like to make. So that has already been established that you know the contents of the letter. So you have a very expressive mission from defense counsel saying, I have proved each and everything I want to prove about this letter through the testimony. And this was coming from the horse's mouth. This is LaDette on the stand, so it's not as if this is some secondhand account of LaDette, and then you need to admit a prior consistent statement from LaDette himself. This is LaDette on the stand. So there was nothing more that needed to be proved, and therefore it was appropriate to keep the letter out. I also think it's important to note that just generally speaking, the issue of LaDette's cooperation was aired extensively throughout the course of trial. It was mentioned in cross examination. It was mentioned in closing. Generally speaking, defense counsel mentioned the cooperation of, or I shouldn't say cooperation, the hoped-for benefits of accomplices at opening. So all of this would have been cumulative, generally speaking, even if it hadn't been specifically established through the course of the testimony. And as the court has already noted, LaDette explicitly admitted to the contents of the letter, page 346, and there was also discussion surrounding it, generally speaking, from 341 to 349. So all of this was appropriately excluded for all of those reasons. I'm happy to move on to Alexander's prior consistent statements. As I read the record, defense counsel said that it was correct, and they said uh-huh when asked if they went into the post-arrest statements at page 474. And then on page 475, when asked about these sentencing statements, they simply said that they had no objection to admitting them, as Judge Sanchez, you pointed out, but that it might open the door to additional questioning. So I read it as simple, no objection to the sentencing statements coming in. Now on the statements themselves, they were in fact used to rebut charges of fabrication. Well, this is what I had a little bit of trouble with, is is there anything in the record as to what the sentencing filing statements actually were? So in terms of extrinsic evidence, I believe the answer is no. In terms of the actual testimony, I believe it'd be at page 475. I understand the testimony of rebuttal purported to describe what had been said before, but the nature of this, and maybe this was because this came up with no objection, and so maybe there's a little gap there because of that, but it's kind of hard for me to understand whether Ms. Alexander was speaking consistently with a prior statement when we don't know what the prior sentencing filing statement was. I think the only evidence is her testimony itself about what she said at sentencing, but she did say that at sentencing she told the story about the Las Vegas story and that she told the story about how Ellison had taken her to Mexico, helped strap the drugs to her, taken her back, had her get out of the car and walk across the border, and there was no implication at trial that she was falsely recounting what she had said in her sentencing filing. So I think the best place you could look would just be 478 and 479, where she actually says, this is what I said at sentencing. And that was all consistent with her testimony at trial where she told a similar story, but it was used to rebut the cross-examination, not only on the Las Vegas story, but on the notion that she was testifying because she hoped to obtain benefits. And again, this was a point that defense counsel didn't go easy on. Page 445 of the record, there's a long discussion about benefits that Alexander hoped to obtain, and defense counsel even says, and that's why you're here, isn't it? He didn't get the answering on it, but that was the implication, was she was trying to get benefits. And this was a point hit on at opening. You can see it at page 179 of the record. It was a point hit on at closing. You can see it at page 831 of the record. So this was a point that defense counsel consistently made, and therefore it made perfect sense to admit prior consistent statements that came before the prospect of a benefit was ever on the table. The post-arrest statements were made before Ellison had even been arrested, and the sentencing statements were made before there was a cooperation agreement in place. I don't think there ever was a cooperation agreement for Alexander, but it was before any cooperation agreement. It was before any grand jury testimony. It was before any discussion with the case agent in Ellison's case. And Alexander says all of this outright at page 403 and 404 and page 477 of the record. She says that these prior statements came before any discussion with the case agent or any grand jury testimony. And my friend on the other side says that there should be a motive to lie from the time that you are arrested. I absolutely agree as to a motive to lie about your own culpability in an offense. But what you don't have a motive to do is falsely confess to a crime and then implicate others. And the cases we cite, the Prieto case from the 11th Circuit, and it collects other cases, and I'll just quote, it says that a judge can reasonably find that a motive to fabricate did not exist until the witness entered into a cooperation agreement. That's all that occurred here. The case that my friend on the other side is citing, Kolokot, and all of the other cases from this court that he's citing, all stand for the proposition that you have a motive to lie about your own guilt in an offense upon arrest. But that's not what we're talking about here. But then, I mean, I take counsel's point that that's not necessarily the only motive to lie. She might have a motive to lie in order to reduce her sentence. So why might there not be other motives to lie apart from lying about someone's own guilt? Sure. Perhaps. I mean, I'll say this argument about my role is one that I'm hearing for the first time today. But I guess the best I can say is even if reasonable minds can differ on this, this is ultimately an abuse of discretion standard. Here, we think it's a plain error standard. Perhaps it's even an invited error standard. So your question is not, could we think that, you know, there might have been some sort of motive for a sentencing benefit. It's, could a district judge reasonably conclude that there was no motive to falsely cooperate in this case? In other words, was the judge acting illogically and implausibly when he made the decision that this should come in as a prior consistent statement? If I ask you to switch gears about the Boyer's statement about the domestic violence of Mr. Ellison, I was a little confused by that. I read the transcript of the eliminate colloquy and then what happened at trial. And as I understand it on cross-examination of Ms. Boyer, defense counsel sought to have her discuss or impeach her based on her post arrest statements to an officer that seemed to have some lies and included the names of other people that did not include Mr. Ellison. But there was never a mention of Mr. Ellison. There was never a mention of him having a gun. I was having a hard time understanding why that cross-examination actually opened the door to allowing evidence that the court had excluded initially. Sure, so Boyer's testimony was Ellison put me up to this drug smuggling. In cross-examination, she was asked about her post arrest statement where she gave a full accounting of how she got to Mexico and who put her up to the smuggling. She said she traveled to Mexico with four individuals, none of whom was Ellison. Then she said that she smuggled drugs because a cab driver named Louie threatened her, again not mentioning Ellison. Then she said that that wasn't actually true and that she had smuggled drugs in conjunction with a lady named Kat. And the natural implication of all that was post arrest. She is pointing the finger at a bunch of other people and not Ellison for who put her up to this drug smuggling. Now, my friend on the other side says that that wasn't actually the inference. It wasn't supposed to be a full accounting of the post arrest statement. The best thing I can point you to for why this was the inference, the natural inference from all of this is defense counsel's own statements at trial. They argued to the jury at page 831 that Boyer had said Kat offered her money to smuggle and not Mr. Ellison. Or if you look just at sidebar, page 532, defense counsel says it is correct and true that he raised this issue that Boyer didn't inculpate him post arrest. So defense counsel was very self-conscious about what he's doing with this evidence. It's meant to show that post arrest she's implicating a bunch of other people and not Ellison. As the district court says, the natural implication of that is therefore she's lying on the stand when she points the finger at Ellison at trial. So did the district court have more of a relevance concern or about a potential prejudicial impact of an allegation of domestic violence against one of the witnesses? It was both. So the district court addresses this in a few different places. You can see it at page 532 and 33, 538 and 39. But the court says that it would be misleading to leave that inference that the only inference that you can draw is that she's fabricating this now when she's got an explanation as to why she didn't. The court also goes on to address prejudice concerns. I believe there's a prejudice objection at page 536 that the court overrules. But ultimately, I think the court covers both. And it's clear why this testimony is necessary. It's because Boyer wasn't just not implicating Ellison at the time of her arrest because she then made it up later. It's because she was afraid of him. And this testimony was fairly restrained. It amounted to a handful of questions. And it essentially was, he carries a gun. He's threatened me. He's acted physically on those threats before. And that's necessary for the jury to assess why, in fact, she was afraid of him or whether she's telling the truth when she says that she's afraid of him and that's why she didn't mention him. But this was fairly restrained. This is actually a small subset of the conduct that Boyer suffered at the hands of Ellison. In fact, there's a reference at page 537 to some under seal filings that were filed for Ms. Boyer that chronicled much more conduct. None of that came in. So this was fairly restrained testimony. And it was aired out from the beginning. The government mentioned this in its inlimity motions. There was a discussion at the inlimit hearing. So is it your view that the moment counsel brought up the post-mortem statement, that alone was enough to open the door? Was there something about the questioning in particular? I think it's the fact that the questioning essentially gave a full accounting of Boyer's offense, all of which excluded Ellison. So it's the fact that the statement covered how she got to Mexico. And then it covered who put her up to the smuggling. And then it even covered a second explanation for who put her up to the smuggling. Again, none of which covered Ellison. So the natural implication is that she's making it up when she points the finger at Ellison on the stand. See, I have a few minutes left. I do want to try and put this in kind of a broader context. All of the issues being raised here really go to periphery issues of corroboration. Ultimately, none of them really affect the core of what we believe is overwhelming evidence of guilt here. At the end of the day, Ellison is arrested at the border with methamphetamine in his car, denies knowledge of that methamphetamine. But he agrees that he is, in fact, a drug dealer. And he even says he likes to hide drugs in the very spot in the car where they are found. You then have Ledet saying he witnessed Ellison load these drugs into the car in Mexico before he crossed. You have Boyer saying the reason he went to Mexico was because she had lost his drug load, so he had to go to earn it back. You have those text messages with Ellison and Spicy J where they're discussing him going to Mexico, things getting loaded, their calls. So you have overwhelming evidence of Ellison's border bust that is really undisputed here. And then you can walk through each one of the cooperators, and it's not purely a matter of their testimony. You have additional corroborating evidence, none of which is being challenged here. So just to take one example, if you look at Ledet's smuggling, it's not just him saying that he smuggled drugs on behalf of Ellison. It's the fact that you have text messages between Primo and Ellison saying you need to deliver the vacuum sealed to Ledet at the hotel. And then right after that, you have text messages between Ellison and Ledet where he's sending him a picture of the meth. And then you have Ellison texting Ledet about meeting at the Burger King, or it was changed to a Jack in the Box. And then you have the cell site location data putting Ellison in the vicinity of that Jack in the Box. None of that has to do with anything that's at issue here. That's additional corroborating evidence from cell site location data and text records and text messages that all shows guilt in this case, even if you were to essentially agree with these points. Now, again, we don't think there's been an error here, but ultimately none of these points move the ball in this case. The same result would have come about. So I'm happy to address other issues with my final minute. Otherwise, I would ask you to move forward. No other questions. Thank you, counsel. Thank you. And we'll give you a couple of minutes for rebuttal. Thank you. Starting with whether or not defense counsel admitted that she had gotten in everything that she wanted to get from the letter, 567 to 568 of the ER, she makes that comment about, I think I've gotten it. First, she tries to introduce the letter again for the 10th time or so. And then she says, when the judge says no, she says, I think I've gotten in everything that I wanted anyway. But then she says, but I can use it as a demonstrative and show it to the jury, right? She still wants to show it to the jury. She doesn't understand. She can't show it to the jury. That follows immediately after that. So she obviously didn't think that she had gotten in everything from the letter that she wanted. She still thought she could show it to the jury. She's just mistaken as to what admitted is as compared to a demonstrative. The second thing, the site where I was talking about the sentencing statement is 4 ER 479. That's when the government counsel then introduces the post-arrest and the sentencing statements. And she talks about the Las Vegas trip thing comes from the sentencing papers, what you told the court in your sentencing papers. Regarding the Boyer matter, there's a testimony that the government claims opens a door. I've quoted it entirely in the brief. It's about a page, maybe a page and a half in transcript. It's about a page, page and a half of the brief. It is very concise. It just relates to a few specific lies she told. There's no portrayal of it. This is an accounting of everything that you did when you went to Mexico. That's ridiculous. And that's not what the district court found either. The district court mistakenly concluded that defense counsel had brought out, had gone into the post-arrest statements and said, you didn't mention Mr. Ellison in your post-arrest statement. Defense counsel said something like that about the platform meeting many months later. But she didn't say anything about that as far as the post-arrest statements. And there's no allegation by the government that Ms. Alexander was afraid of Mr. Ellison during the profit statement. So the district court just has facts wrong on that one. And as far as Hanel Serra, well, it's kind of hard to pick it all apart because there's so many errors here, touching so many parts of the government's case. But Anthony Ledet was 100 pages of transcript. He touched on every part of the case. I'm sorry. Judge Gould? There's errors throughout these witnesses that touch on every part of the case. So, you know, kind of doing a harmless error analysis, harmless error analysis requires going through all those errors and what the court finds is impactful or not. Thank you, Mr. Burns. The matter will take you both for your helpful arguments. The matter will be submitted and we will take a break.
judges: GOULD, CLIFTON, SANCHEZ